USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 13, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

DONNA LEVY,

                 *Petitioner*,

    -against-

UNITED STATES OF AMERICA,

                 *Respondent*.

-----------------------------------------------------------X

16 Civ. 5336 (PAC)
11 Cr. 62 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Following a three-week trial, a jury convicted Donna Levy on March 21, 2013 of all five counts charged against her in a securities and mail fraud pump and dump scheme involving millions of dollars. On February 19, 2014, the Court sentenced Mrs. Levy to 66 months in prison. Mrs. Levy now petitions, pursuant to 28 U.S.C. § 2255, for a reduction in her sentence and for her immediate release ("Petition"). She asserts that her counsel was ineffective for failure to advise her properly about a guilty plea or cooperation agreement. There is no merit to her Petition; and for the reasons stated below, the Court denies the Petition.

**BACKGROUND**

On October 4, 2010, the government filed a complaint against Mrs. Levy and ten other individuals. Dkt. 1. On January 19, 2011, the government filed an indictment naming Mrs. Levy and six other individuals as defendants. Dkt. 86. On December 21, 2011, the government filed a third superseding indictment and added Mrs. Levy's husband, David Levy, as a defendant. Dkt. 134. On June 28, 2012, the government filed a fifth superseding indictment against Mr. and Mrs. Levy and one other defendant (the "Indictment"). Dkt. 188. The Indictment charged Mrs. Levy

1

with two counts of conspiracy to commit securities fraud and wire fraud, and three counts of securities fraud. The charges in the Indictment related to pump and dump schemes orchestrated by Donna and David Levy.

In total, 13 defendants have been charged in this matter. The Levys are the only two defendants that have so far proceeded to trial. By the time the Levys' trial started on March 5, 2013, 10 of the 13 defendants had pleaded guilty. All 10 of the defendants that pleaded guilty have since been sentenced.[1] Five—Ricardo Fernandez, Stinson Bland, William Mackey, Thomas Prezioso, and Bradley Susser—received sentences of between 6 and 18 months imprisonment ("Pleading Defendants"), and the other five—Jeffrey Halbirt, Jeffrey Hurwitt, Michael Steinberg, Michael Oiring, and Fotis Georgiadis—received 5K1 letters and sentences of time served ("Cooperating Defendants").

On March 21, 2013, the Levys were found guilty of all charges against them. Following conviction, the Levys moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal, and in the alternative, pursuant to Fed. R. Crim. P. 33 for a new trial. On July 15, 2013, the Court denied the Levys' motions. Mr. Levy was sentenced to 108 months in prison on January 24, 2014, and Mrs. Levy was sentenced to 66 months in prison on February 19, 2014.

The Levys appealed their convictions. Mrs. Levy challenged (1) the legal sufficiency of the trial evidence relating to market manipulation; (2) the Court's jury instruction on market manipulation; (3) the Court's decision not to instruct the jury on puffery and the "bespeaks caution" doctrine; (4) the legal sufficiency of the trial evidence relating to material misrepresentations; and (5) the Court's decision to not allow Mrs. Levy's counsel to cross

---

[1] The remaining defendant, Dwayne Bigelow, has not been sentenced; the Court does not include him in its analysis in this Opinion & Order.

2

examine two adverse witnesses. She also adopted the arguments raised in Mr. Levy's appeal that the Court erred: (1) in its jury instruction on burden of proof; (2) in refusing to suppress wiretap and derivative evidence; (3) in admitting evidence seized pursuant to a search warrant; (4) in finding a border search legal; and (5) in its restitution orders. On November 17, 2015, the Second Circuit entered its mandate affirming the Court's final judgments. Dkt. 451.

The thrust of Mrs. Levy's Petition is that her prior counsel was ineffective because they failed to properly advise her of the potential benefits of pleading guilty or cooperating with the government. She asserts that the government made overtures indicating amenability to offering a plea deal or accepting her cooperation prior to trial, but that counsel failed to advise her of, among other things, the government's overtures, the strengths and weaknesses of her case, and the possible sentencing ranges following trial, a plea deal, or cooperation. She contends that if she had been properly advised, she would have cooperated or pleaded guilty.

On August 3, 2016, the Court directed Mrs. Levy's prior counsel, Howard Srebnick, "to respond to allegations of ineffective assistance of counsel" set forth in Mrs. Levy's Petition. *See* Dkt. 474. On September 26, 2016, Mr. Srebnick submitted a letter responding to Mrs. Levy's assertions in her Petition about his and Alex Arteaga-Gomez's representation of Mrs. Levy ("Srebnick Letter"). Dkt. 483. Mrs. Levy submitted an affidavit ("Levy Aff.") with her Reply papers. Dkt. 492.

## DISCUSSION

### I. Legal Standards

#### A. Ineffective Assistance of Counsel

A federal prisoner may move the sentencing Court under 28 U.S.C. § 2255 to vacate, set aside, or correct an illegally imposed sentence. *See* 28 U.S.C. § 2255(a). "The Sixth

3

Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," *Missouri v. Frye*, 566 U.S. 133, 141 (2012), and a § 2255 petition may be brought on the basis of ineffective assistance of counsel.

To establish a claim of ineffective assistance of counsel, a defendant must show that (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Wash.*, 466 U.S. 668, 688, 694 (1984). A defendant's failure to make the required showing under either of the two *Strickland* prongs is fatal to an ineffective assistance of counsel claim. *See id.* at 700.

Under the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. With respect to plea deals, "counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (citations omitted).

Under the second prong, a defendant asserting ineffective assistance based on the rejection of a plea deal must show that (1) "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court;" (2) "the court would have accepted its terms;" and (3) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

**B.  Hearing**

Section 2255 provides that "[u]nless the motion and the files and records of the case

4

conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. 2255(b). If, however, "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (quoting Rules Governing § 2255 Proceedings for the United States District Courts, Rule 4(b)).

"To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Id.* at 213 (2d Cir. 2009) (internal quotation marks omitted). In the context of a rejected plea offer, the defendant "must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, the petitioner would have accepted the plea offer." *Id.* at 215. A defendant's statement that "she would have accepted the proposed plea offer if properly advised" is sufficiently credible to warrant a hearing "where it is accompanied by some objective evidence, such as a significant sentencing disparity." *Id.* at 216 (internal quotation marks omitted).

**II. Analysis**

Mrs. Levy states in her affidavit, "[h]ad I been advised of the possibility of several years or more of imprisonment if convicted and the relative strengths and weaknesses of my case, I would have more likely than not cooperated or pleaded guilty in pursuit of a lesser sentence." Levy Aff. ¶ 19. Mrs. Levy's self-serving statement must be rejected.

First of all, there never was a formal plea offer; no writing that sets forth that there will be a plea; or a calculation of the offense level; or the development of a criminal history score; or

5

a determination of a range for a Guidelines sentence. None of these indicia of a formal plea offer are present. Instead, Mrs. Levy asserts that her defense counsel forwarded three messages from Assistant U.S. Attorney Howard Master "requesting Mrs. Levy to 'come in and talk'" ("Master E-mails"). Pet. at 2. She then asserts that she "sought on multiple occasions to discuss the emails with her defense counsel" by sending "emails on the subject," but that her "correspondence was ignored." *Id.* But Mrs. Levy's petition is not supported by an affidavit; nor does she submit the supposed Master E-mails; nor any of her requests seeking to discuss the supposed Master E-mails. Mr. Srebnick, in his letter to the Court, states that he located no record of the alleged e-mails from Mr. Master, and that neither he nor Mr. Arteaga-Gomez had any recollection of those e-mails. Srebnick Letter at 3. Following Mr. Srebnick's letter, the government stated that no such e-mails were sent. Opp'n at 12 ("Even had such communications been sent (and they were not) . . . .").

Significantly, Mrs. Levy's Reply papers filed on November 16, 2016 completely abandon her prior assertions that the Master E-mails existed, or that she ever sent e-mails to her counsel requesting to discuss them. Those assertions are wholly cast aside; and instead, Mrs. Levy latches onto Mr. Srebnick's explanation that he and Mr. Arteaga-Gomez "met with the prosecutors in an effort to persuade them to offer a resolution that would spare Ms. Levy the risk of a lengthy prison sentence, should she be convicted after trial" and that "the prosecutors indicated that any potential resolution would necessarily involve a guilty plea to one or more charges in the indictment, with a corresponding advisory guideline range suggesting many years in prison." Srebnick Letter at 2. Mrs. Levy's new theory is that "Mr. Srebnick undeniably describes a plea negotiation in his letter," and that those "plea discussions are sufficiently concrete to merit constitutional scrutiny." Reply at 6. But an invitation to talk is not a formal

6

plea offer; indeed it is not even an informal plea offer. Further, no one claims Mrs. Levy has a constitutional right to a plea offer.

Mrs. Levy's assertions cannot be credited. Her narrative changes between the Petition and Reply and bespeaks gamesmanship. It appears that Mrs. Levy made a spurious claim about the supposed Master E-mails to provide some basis for her requested relief, then waited to see what the government's response would be before submitting her belated affidavit.

Aside from Mrs. Levy's lack of credibility, there is no objective evidence to support her statement that she would have pleaded guilty or cooperated. First, there was nothing on the table to which she could have pleaded guilty, and it is highly dubious that she would have cooperated against her husband. Mrs. Levy concedes that she was never formally offered a plea deal or a cooperation agreement.

Next, Mrs. Levy points to the disparity between the sentences imposed on her and on her co-defendants and asserts that had she known of this, she would have "cooperated or pleaded guilty." The Court addresses Mrs. Levy's statements about pleading guilty and cooperating in turn.

### A. Guilty Plea

Mrs. Levy's comparison of her role in the charged crime to her co-defendants is completely inappropriate because she was not similarly situated to her co-defendants. *See* Pet. at 3 ("Mrs. Levy's adjudged level of involvement in the scheme was similar to several of her co-defendants who pleaded or cooperated and received drastically lower sentences."). Though she may wish the facts were otherwise, wishing does not make it so. The fact of the matter is that Mrs. Levy was involved for a long time at the very crest of the illicit enterprise, unlike her co-defendants. All of the Pleading Defendants had less significant roles, dealt with lower amounts

of money, had lower offense levels, and lower Guidelines calculations. The best Mrs. Levy can do to support her untenable position is to take out of context the Court's comment made during Mr. Hurwitt's sentencing to suggest, counterfactually, that her involvement was somehow similar to that of her co-defendants. *See* Pet. at 21 & n.6.

The Court stated at Mr. Hurwitt's sentencing, "[w]e have a lot of experience with sentencing people who participate as touters, promoters and ringleaders." Hurwitt Sentencing Tr., Dkt. 396, at 7. Mrs. Levy asserts that the only defendants sentenced before Mr. Hurwitt were Mr. Bland, Mr. Mackey, Mr. Fernandez, Mr. Susser, Mr. Prezioso, and herself (conveniently omitting that the other ringleader, Mr. Levy, had also been sentenced by then). Her argument is that the Court must have been saying that all previously sentenced defendants (with potentially the exception of Mr. Prezioso) participated in the same capacity and were thus similarly situated. That is simply untrue, as a matter of fact; and it is a complete mischaracterization of what the Court was saying. While the defendants that had been sentenced included touters and promoters, like Mrs. Levy, the ringleaders that the Court was referring to were Donna and David Levy; not the other lower-ranking co-defendants who had been sentenced.

The Court summarized Mrs. Levy role, as compared against her co-defendants' roles, at her sentencing: "With respect to the sentences of others, I find that Ms. Levy's role is substantially different in the length of time that she was involved, the number of stocks that were involved, the level of activity in which she participated and so forth. Those are distinguishing characteristics from those defendants who received other sentences." Donna Levy Sentencing Tr., Dkt. 371, at 26; *see also id.* at 21 ("The trial record is filled with evidence that Ms. Levy recruited, managed, and supervised other promoters."); Oiring Sentencing Tr., Dkt. 488, at 10–

8

11 ("I presided at a trial in which Mr. Master and Ms. Cohen, who represented the government, demonstrated the two Levys ran this nefarious scheme."); Prezioso Sentencing Tr., Dkt. 336, at 21 ("[T]he Levys really wreaked a lot of havoc and those who assisted the Levys wrecked [sic] a lot of havoc in the marketplace."). The record shows that this was the government's assessment of Mrs. Levy's role as well. *See* Gov't Sentencing Mem. for Donna Levy, Dkt. 354, at 2 ("[T]he defendant's arguments for a sentence similar to those of co-defendants who pleaded guilty are without merit, both because her crimes are more serious than those committed by those defendant[s] and because her crimes are, in many respects, as egregious as those committed by David Levy."); *see also* Susser Sentencing Tr., Dkt. 316, at 16–17 ("So at the top of the sort of chain would be someone like Donna Levy, who was orchestrating a campaign and saying, you go out on Monday, you go out on Tuesday, you got out on Wednesday, you go out on Thursday."); *id.* at 16 ("I would say that all the defendants who have been sentenced at this point are at roughly the same level, they were promoters for hire but not top-level promoters, such as Donna Levy and David Levy . . . ."); Prezioso Sentencing Tr., Dkt. 336 at 14 (explaining that Prezioso's involvement "pales in comparison to the millions upon millions of dollars that David and Donna Levy earned from their participation in the scheme").

With respect to the Pleading Defendants, the loss amount attributed to Mrs. Levy also reflects that Mrs. Levy was not similarly situated to them. The government argued in its sentencing memorandum that the loss attributable to Mrs. Levy was between $7 million and $20 million, and that a 20-point enhancement to her offense level was therefore warranted. Gov't Sentencing Mem. for Donna Levy at 3–4. Mrs. Levy took the position that the government failed to sustain its burden to prove loss, so no enhancement should have applied. However, based on the sentencings of other defendants in the matter, Mrs. Levy "recognize[d] that the

9

Court [was] likely to figure the loss/gain enhancement in determining the advisory Guidelines range," and asserted that if the Court were to apply an enhancement based on loss, it should look to gain as a proxy and conclude that Mrs. Levy's gain was no greater than $1,543,452. *See* Donna Levy Sentencing Memorandum, Dkt. 352, at 10. The Court ultimately determined that the loss attributable to Mrs. Levy was over $7 million but under $20 million, resulting in a 20-point enhancement. *See* Donna Levy Sentencing Tr. at 20.

In contrast, it is apparent from the record that the Pleading Defendants did not have a similar 20-point enhancement to their offense levels.[2] Their offense levels ranged from 17 to 19, as compared to Mrs. Levy's offense level of 36. This makes sense in light of their less extensive participation in the criminal activity. It is therefore inappropriate for Mrs. Levy to compare her sentence against the sentences imposed on the Pleading Defendants.

Even giving Mrs. Levy all the benefit of the doubt that the government would have offered her a plea deal, and that she would have accepted it notwithstanding her insistence on her innocence, she still would be unable to show a sentencing disparity:

| Defendant | Offense Level / Criminal History Category | Sentencing Guidelines Range | Term of Imprisonment | Percent Downward Variance | Docket Cite |
|---|---|---|---|---|---|
| Stinson Bland | 19 / I | 30-37 months | 13 months | 57-65% | 169, 170 |
| William Mackey | 19 / I | 30-37 months | 18 months | 40-51% | 171, 173 |
| Ricardo Fernandez | 19 / I | 30-37 months | 12 months and 1 day | 60-68% | 190, 192 |
| Bradley Susser | 19 / I | 30-37 months | 6 months | 80-84% | 310, 316 |
| Thomas Prezioso | 17 / I | 24-30 months | 6 months | 75-80% | 330, 336 |
| **AVERAGE** | | | | **62-70%** | |
| Donna Levy | 36 / I | 188-235 months | 66 months | 65-72% | 361, 371 |

---

[2] Mrs. Levy asserts that "the government was friendlier in its forfeiture calculations of cooperating/pleading defendants." Pet. at 23. But as is evident from Mrs. Levy's sentencing, a defendant's forfeiture does not necessarily reflect the loss attributed to that defendant for purposes of calculating the applicable offense level.

10

On average, the Pleading Defendants' sentences were between 62 and 70% less than Guidelines sentences. Mrs. Levy's sentence was between 67 and 72% less than the Guidelines sentence, and is slightly better than the Pleading Defendants' average. Even if the Court were to have used Mrs. Levy's own gain calculation of $1,543,452 as a proxy for loss, Mrs. Levy's Guidelines range would have been 121-151 months. Her 66-month sentence of imprisonment would still have represented a 45 to 56% downward variance from the Guidelines range, and would have been within the range of the Pleading Defendants' downward variances (40 to 84%).

On these facts, there was no sentencing disparity between Mrs. Levy's sentence and the Pleading Defendants' sentences. Consequently, Mrs. Levy has failed to "produce[] or identif[y] evidence sufficient to show, or permit an inference of, a significant disparity between the terms of a plea offer and [her] ultimate sentence exposure after a trial conviction." *Puglisi*, 586 F.3d at 217.

**B.     Cooperation**

Mrs. Levy next argues that her counsel was ineffective in connection with her contemplated cooperation considering the disparity between her sentence and the time-served sentences imposed on the Cooperating Defendants. To begin, there is no basis to conclude that the government would have accepted Mrs. Levy's cooperation. There is no credible evidence that the government ever sought her cooperation, and moreover, over half of Mrs. Levy's co-defendants that have been sentenced (including Mr. Levy) did not receive 5K1 letters. While Mrs. Levy argues that she has sought to cooperate post-trial, it is telling that she has failed to do so.

Next, Mrs. Levy offers no "factual specificity" regarding any potential cooperation the government might have accepted. *Cf. Puglisi*, 586 F.3d at 218 ("[A]ppellant's affidavit is devoid

11

of any factual specificity regarding [the plea] agreement, appellant's supposed understanding of its terms, and whether it required cooperation."). Because she tries to rely on the sentences imposed on the Cooperating Defendants as objective evidence, it bears noting what the Cooperating Defendants did in connection with this matter; none of which Mrs. Levy did—or even offered to do.

For instance, by the time Mr. Hurwitt's counsel was appointed, Mr. Hurwitt "had already turned over his computers, [and] had spoken to the agents freely." Hurwitt Sentencing Tr. at 4. Mr. Halbirt "fully and forthrightly explained his history from the very beginning, acknowledging the wrongfulness of his conduct, and he provided useful information from the start." Halbirt Sentencing Tr., Dkt. 436, at 7. He was also "ready, willing and able to testify if necessary." *Id.* Any time Mr. Oiring's investigating agent had questions, Mr. Oiring was "more than willing to answer, go back to his files, to look up information." Oiring Sentencing Tr. at 9. And Mr. Georgiadis testified at the Levys' trial. *See* Georgiadis Sentencing Tr., Dkt. 431, at 2–3.

The Cooperating Defendants also all accepted responsibility. *See* Halbirt Sentencing Tr. at 6 ("I am extremely sorry for what I have done."); Hurwitt Sentencing Tr. at 9 ("I take full responsibility for what I did. It was wrong. I know that. I am really sorry for what I did."); Steinberg Sentencing Tr., Dkt. 402, at 6–7 ("I learned a very costly lesson. I'm no longer in that business, and involved in nothing related to the stock market anymore. . . . I apologize to the courts, as well."); Oiring Letter to Court, Dkt. 479-1, at 1 ("I know that what I did was wrong, and I have accepted responsibility and the consequences of my actions."); Georgiadis Sentencing Tr. at 4–5 ("I want to start off by saying how truly sorry I am to the victims of the penny stock scheme."). Mrs. Levy, in contrast, has been utterly unwilling to do so.

Furthermore, all Cooperating Defendants, including those on "the lowest rung of the

ladder," pleaded guilty. *See* Hurwitt Sentencing Tr. at 7. Even where a cooperator provided prompt and extensive cooperation, the government still took the position that he needed to plead guilty. *See* Georgiadis Sentencing Submission, Dkt. 419, at 5 ("[T]he prosecutors informed Mr. Georgiadis, through his counsel, that while they recognized his cooperation and several mitigating factors in his favor that supported a non-prosecution agreement, they believed that on balance he needed to plead guilty."); *see also* Oiring Sentencing Submission, Dkt. 479, at 9 ("[Mr.] Oiring entered a guilty plea pursuant to a cooperation agreement.").

There is nothing to suggest that Mrs. Levy would have been similarly situated to the Cooperating Defendants in terms of cooperation. The most Mrs. Levy says about her hypothetical cooperation is that "[w]hen federal agents initially approached [her] after [her] arrest, [she] was willing to speak with them as [she] felt [she] had nothing to hide." Levy Aff. ¶ 17. Moreover, it is unclear whether Mrs. Levy is treating cooperation and pleading guilty as two separate options, and whether she would have been prepared to plead guilty as part of her cooperation, as the Cooperating Defendants did. *See* Levy Aff. ¶ 19 ("I would have more likely than not cooperated *or* pleaded guilty . . . ." (emphasis added)). And Mrs. Levy does not dispute that she "expressed no interest in pursuing" cooperation post-trial after counsel told her that "[t]he prosecutors indicated that as a pre-condition of cooperation, [she] would need to accept responsibility for the crimes of which she had been convicted." Srebnick Letter at 3. Even assuming the government would have accepted Mrs. Levy's cooperation, there is simply no basis to assess what Mrs. Levy was willing to do to cooperate and whether the government would have considered it sufficient to warrant providing her with a 5K1 letter. A bald assertion that she "would have more likely than not cooperated" is not sufficient.

Finally, Mrs. Levy's self-serving assertion that she would have cooperated directly

13

contradicts her own pre-sentence expression of "her refusal to work in the rat program to assist in the government's investigation." *See* Donna Levy Sentencing Tr. at 22; *see also* Gov't Sentencing Mem. for Donna Levy, Dkt. 354, at 16 (Mrs. Levy stated "that she decided she 'did not want to work in the rat program,' *i.e.*, by cooperating with the Government's investigation.").

\* \* \*

In sum, Mrs. Levy has failed to provide any credible evidence that, but for the allegedly ineffective assistance of her counsel, she would have been offered the chance—and would have agreed—to plead guilty or cooperate, and that a plea deal or cooperation would have resulted in a less severe sentence. Consequently, Mrs. Levy's petition is denied.[3] No hearing is necessary.

## CONCLUSION

For the foregoing reasons, Mrs. Levy's Petition is denied. Because Mrs. Levy has not "made a substantial showing of the denial of a constitutional right," a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to terminate the motion pending at docket number 468 in Case No. 11 Cr. 62, and to close Case No. 16 Civ. 5336.

Dated: New York, New York
April 13, 2017

SO ORDERED

*/s/ Paul A. Crotty*
PAUL A. CROTTY
United States District Judge

---

[3] Mrs. Levy also requests that the Court "[r]educe [her] criminal monetary penalty consistent with the manner of calculating the criminal monetary penalties of her similarly-situated co-defendants." Pet. at 28. She fails, however, to identify who her "similarly-situated co-defendants" are or how their penalties were calculated differently from hers; or to explain why this relief is appropriate under § 2255. *See United States v. Boyd*, 407 F. App'x 559, (2d Cir. 2011) (summary order) ("[A] 'monetary fine is not a sufficient restraint on liberty to meet the "in custody" requirement,' even if raised in conjunction with a challenge to a sentence of imprisonment.") (quoting *Kaminski v. United States*, 339 F.3d 84, 87–88 (2d Cir. 2003)).

14